UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SILVER POINT CAPITAL, L.P. ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission"), for its Complaint against Defendant Silver Point Capital, L.P. ("Silver Point" or "Defendant"), alleges as follows:

## SUMMARY

1.  Silver Point, as a registered investment adviser, was required by law to establish, implement, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent the misuse of material nonpublic information ("MNPI"). However, Silver Point's policies and procedures were not reasonably designed to address the risks associated with its specific business model. Further, Silver Point failed to enforce the policies and procedures it did have as to a Silver Point consultant who had routine access to MNPI. These failures allowed for a largely unfettered, unmonitored flow of information from the consultant to Silver Point's public trading side.

2.  As an investment adviser that manages hedge funds, one of Silver Point's core business strategies is investing in bankrupt or distressed entities that were struggling to make payments on debt they had issued. To execute this strategy, Silver Point was organized into two

sides: the "public side" and the "private side." The public side actively bought and sold the debt of the distressed entity. The private side participated as a creditor/investor in confidential negotiations over how the distressed entity could repay its debt, often receiving MNPI in those negotiations. From 2004 to 2021, and specifically in 2019 and 2020, Silver Point consultant Chaim Fortgang served as Silver Point's private side representative in these confidential negotiations.

3. This public/private business model presented a substantial risk that information from the confidential negotiations would leak from the private side to the public side and then be misused in trading decisions. To prevent leakage of MNPI from its private side to its public side, Silver Point purported to rely on an information barrier between the two sides. However, Silver Point's written policies and procedures establishing the information barrier were not reasonably designed in light of its public/private business model and Fortgang's role at Silver Point. Further, the information barrier was not implemented as to Fortgang to prevent the misuse of the MNPI he had from his work for Silver Point.

4. Through this action, the Commission seeks a civil penalty and a permanent injunction prohibiting the Defendant from further violations of the relevant provisions of the federal securities laws.

**VIOLATIONS**

5. By virtue of the foregoing conduct and as alleged further herein, Silver Point has violated Sections 204A and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C §§ 80b-4a; 80b-6] and Rule 206(4)-7 promulgated thereunder [17 CFR § 275.206(4)-7].

6. Unless Silver Point is enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses

of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to the authority conferred upon it by Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d), 80b-9(e)].

8. The Commission seeks a final judgment: (a) permanently enjoining Silver Point from violating the Advisers Act laws and rules pursuant to Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)]; (b) ordering Silver Point to pay a civil money penalty pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (c) ordering any other and further relief the Court may deem just and proper.

## DEFENDANT

9. **Silver Point Capital, L.P.** is a hedge fund manager based in Greenwich, Connecticut. It has been registered with the SEC as an investment adviser since 2012. In its Form ADV Part 2A, filed in March 2024, Silver Point reported that it had assets under management of $28.9 billion.

## RELEVANT INDIVIDUAL

10. **Chaim Fortgang ("Fortgang")**, deceased, was a resident of Brooklyn, New York. An ex-big law partner, Fortgang was a well-known bankruptcy attorney during his legal career. He worked for Silver Point from at least 2004 to October 2021 pursuant to a series of consulting agreements.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Advisers Act Sections 209(d), 209(e), and 214(a) [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14(a)].

12. Defendant, directly and indirectly, has made use of the means or instrumentalities

of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Advisers Act Section 214(a) [15 U.S.C § 80b-14(a)]. Defendant may be found in, is an inhabitant of, or transacts business in the District of Connecticut, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.

## BACKGROUND

### A. Silver Point's Business Model Posed a High Risk of Misuse of MNPI and Its Procedures Did Not Address that Risk

14. All investment advisers, like Silver Point, are required by law to establish, implement, and enforce written policies and procedures that are reasonably designed to prevent the misuse of MNPI. These policies and procedures must take into consideration the nature of the adviser's business, including the circumstances under which the adviser receives MNPI.

15. Silver Point's business model is heavily focused on investing in distressed debt.

16. Since at least 2004, Silver Point divided its business between a "public side" and a "private side."

17. As relevant here, the public side invested in the debt markets for the funds that Silver Point managed. It consisted of analysts that researched distressed entities and made recommendations to buy and sell securities issued by those same entities, a group that considered and approved the trading recommendations, and traders that executed the trades.

18. Once Silver Point was an investor or holder of debt in a distressed entity, it often joined the confidential negotiations aimed at crafting a repayment plan or restructuring by the distressed entity. Creditors with similar holdings or interests frequently teamed up to form creditors' committees for purposes of the negotiations.

19.     Silver Point typically sent representatives from its private side to sit on creditors' committees. The role of the private side representatives was to advocate for advantageous recoveries for the distressed debt Silver Point was holding and/or concurrently trading.

20.     Members of these creditors' committees routinely exchanged MNPI with the debtor and/or become aware of MNPI during these confidential negotiations, upon which it would be illegal to trade. In the context of restructuring proceedings, MNPI concerning the parties' negotiating positions, proposed settlement terms, or the debtor's financial condition and ability to pay was highly valuable information for investors looking to trade in securities of the distressed entities.

**B. Silver Point Routinely Used Fortgang to Receive MNPI on its Behalf**

21.     In 2004, Fortgang began working for Silver Point pursuant to a written agreement that identified him as a consultant. Prior to joining Silver Point, Fortgang practiced bankruptcy law for decades and was widely known in the bankruptcy bar. He had a reputation for being aggressive and uncompromising while advocating on behalf of his clients.

22.     Fortgang worked almost exclusively for Silver Point as a consultant from 2004 until his death in 2021. Although his consulting agreement with Silver Point permitted him to work as a consultant to other entities, he rarely did so. In those rare instances, Fortgang was required to notify Silver Point before doing so—giving Silver Point the right to decide whether such outside work would present a conflict or interfere with Fortgang's work for Silver Point.

23.     Silver Point paid Fortgang a flat, monthly consulting fee of $183,333—irrespective of hours worked or work product. Fortgang also was eligible for a discretionary, year-end bonus. Although Silver Point solicited feedback on his performance from various public and private side employees who worked with Fortgang, his bonus was determined by the

executive who approved trading recommendations for Silver Point, with no objective rating criteria.

24. Silver Point employed Fortgang to advise both its public and private sides on issues that arose in connection with Silver Point's investments and related restructurings. At times, he was copied on trading recommendations made by Silver Point's public side analysts.

25. His work on behalf of Silver Point also included sitting on creditors' committees, where he routinely received MNPI and engaged in negotiations on the terms of various bankruptcy restructurings. Often, Fortgang was Silver Point's sole representative on these creditors' committees.

**C. Silver Point Relied on Its Information Barrier to Satisfy Its Obligations as an Investment Adviser and Still Trade While in Possession of MNPI**

26. To enable Silver Point's public side to actively trade the debt of a distressed entity while the private side simultaneously participated in confidential negotiations (and received MNPI) about the same entity, Silver Point purported to adhere to an information barrier between the two sides.

27. The information barrier's design and implementation were critical to satisfying Silver Point's legal obligations to establish, implement, and enforce written policies and procedures reasonably designed to prevent the misuse of MNPI.

28. Silver Point's Compliance Manual contained the Information Barrier Policies and Procedures (the "barrier policy") that dictated how the barrier should function.

29. The barrier policy, which remains in effect, applied to all "Silver Point directors, officers, partners, employees, temporary employees and any other affiliated persons designated by [the Compliance department] (which **may include consultants**, independent contractors and certain other persons)" [emphasis added]. It required that Silver Point's Legal and Compliance

Department ("Compliance") designate each of these covered individuals as either public, private, or administrative, which then determined the level of surveillance and other oversight warranted by Compliance to prevent the leakage of MNPI.

30. For example, certain communications between public and private employees were subject to enhanced monitoring, surveillance, and logging requirements by Compliance. The central requirement of the barrier policy was that any private side employee who wanted to communicate with a public side employee (or vice versa) about <u>any</u> investment-related matter (*i.e.*, not strictly personal or administrative) must first inform Compliance. Such preapproval was required regardless of whether the private side possessed "Confidential Information," which included, but was not limited to, MNPI. Such a communication between the public and private sides was referred to as a "wall crossing."

31. Per the barrier policy, the employee seeking preapproval of the proposed wall crossing was required to provide Compliance with certain information, including the participants, the name of the issuer to be discussed, the discussion topics, whether there was an information disparity between the public and private sides, and whether the private side had, and intended to share, Confidential Information.

32. When the private side had Confidential Information about an issuer but did not plan to disclose such information to the public side during a discussion about that same issuer, the barrier policy required Compliance to preapprove the communication, as described above, <u>and also</u> to monitor and log the communication. Relatedly, Compliance was required by the barrier policy to maintain a log of all wall crossings between the public and private sides to ensure daily monitoring of trading in issuers about which the private side had Confidential Information.

33. When the private side had Confidential Information about one entity but planned to discuss a different entity with the public side about which it did not have Confidential Information, the barrier policy <u>still</u> required the employee seeking the wall crossing to inform Compliance ahead of time (with limited exception related to time-sensitivity). The barrier policy, as written, left it to Compliance's discretion whether to also monitor the communication, but it was Silver Point's professed practice to monitor and log all such communications between its public and private sides.

34. Silver Point's barrier policy also required Compliance to maintain a "watch list" and a "restricted list" to track the firm's investments and levels of knowledge. Compliance placed an issuer on the restricted list when the public side learned MNPI about that issuer. Silver Point was prohibited from trading in securities of issuers on the restricted list.

35. The watch list, on the other hand, included issuers about which only the private side had Confidential Information. This list was only accessible to Compliance because, as is explained in the barrier policy, "the very fact that Private Employees are working on a particular financing or other transaction may constitute [MNPI]." As such, Compliance's involvement in preapproving and monitoring discussions between public and private sides was critical.

36. Reflecting the substantial risk in Silver Point's business model that the private side may pass MNPI to the public side, the barrier policy also dictated physical separation between the public and private sides within Silver Point's office space, with key card access required for the private side space. Private side employees were prohibited from having any investment-related conversations or meetings with, or in the physical presence of, public side employees while in the office.

37. Consistent with Fortgang's function at Silver Point and the heightened risk attendant to his role, he agreed to be bound by the barrier policy. Specifically, his consulting agreement mandated that he "comply with all of [Silver Point's] compliance policies and procedures, including, without limitation, the [barrier policy]…."

38. Indeed, in at least two instances, Compliance did monitor and log Fortgang's communications with public side employees, as required by the barrier policy, categorizing him as a "Private Employee" in the log. Silver Point also, at times, placed or kept an entity on its watch list (thus triggering additional monitoring) when only Fortgang had MNPI about the entity. But these few instances were the exception to the rule.

**D. Silver Point's Policies and Procedures Were Deficient**

39. Silver Point failed to establish and adopt written policies and procedures reasonably designed to prevent the misuse of MNPI in light of its public/private business model and Fortgang's unique and critical role within the firm.

40. Specifically, Silver Point's barrier policy did not clearly require that consultants like Fortgang, who regularly sat on creditors' committees and received MNPI, be subject to the same oversight and controls as private side employees who also sat on creditors' committees and received MNPI. Instead, Silver Point's barrier policy was, at best, ambiguous—stating only that consultants like Fortgang <u>may</u> be designated as private employees, without providing any criteria for Compliance to use to determine when to do so.

41. Silver Point's deficient policies and procedures meant Fortgang's interactions with the public side went largely unpoliced by Compliance, notwithstanding Fortgang's routine exposure to MNPI as Silver Point's creditors' committee representative, his near-constant

9

contact with members of the public side, and the incentives created by his performance-based compensation.

### E. Silver Point Failed to Enforce the Barrier Policy as to Fortgang and His Activities

42. Silver Point's enforcement of the barrier policy as to Fortgang was also deficient.

43. Based on Fortgang's role and his routine access to MNPI on Silver Point's behalf, he functioned as, and should have been designated by Compliance as, a private employee for purposes of applying the barrier policy to him. However, Silver Point failed to treat or designate him as such, notwithstanding his express agreement to be bound by the barrier policy. By not designating Fortgang as a public or private employee, Silver Point allowed Fortgang to operate in a loophole, effectively exempting him from the public/private divide that was crucial to ensuring that Silver Point did not misuse of MNPI.

44. Silver Point also did not consistently preapprove and, where appropriate, monitor and log Fortgang's calls and in-person communications with the public side.

45. Nor did Silver Point conduct email surveillance, periodic email check-ins, or trainings for Fortgang as it did for private side employees.

46. Silver Point's failure to enforce its barrier policy created a substantial risk of MNPI leakage from Fortgang to the public side, and therefore a risk of illegal insider trading by Silver Point.

47. Silver Point's trading in defaulted bonds issued by the Commonwealth of Puerto Rico ("Puerto Rico bonds") underscores the risk created by Silver Point's failure to establish, implement, and enforce policies and procedures reasonably designed to prevent the misuse of MNPI.

48. As described in more detail below, between September 17, 2019 and February 7, 2020, Silver Point purchased over $260 million of Puerto Rico bonds. Over the same period, while Fortgang was in possession of MNPI about the same Puerto Rico bonds, he had more than 500 calls with public side employees without the involvement of Compliance. At the very least, these calls should have been preapproved by Compliance pursuant to the barrier policy, so that Compliance could carry out its obligation to determine whether to approve, monitor and/or log the calls.

49. When Silver Point sold the Puerto Rico bonds it amassed during that period, it generated profits of over $29 million.

50. Silver Point's deficient establishment and enforcement of its barrier policy as to Fortgang meant he had hundreds of opportunities to improperly share MNPI with the public side, presenting a substantial risk that Silver Point generated such profits by trading on the basis of MNPI.

### *Holes in Silver Point's Barrier: The Puerto Rico Bankruptcy Example*

51. In 2015, the Commonwealth of Puerto Rico ("Puerto Rico") experienced a financial collapse that resulted in it defaulting on a substantial part of its outstanding debt. In June 2017, a federal bankruptcy court appointed a panel of federal judges to conduct a mediation between Puerto Rico and its creditors to reach an economic resolution on recoveries for creditor bondholders. The court order appointing the mediators specified that the participants and the mediators would be bound by confidentiality.

52.     From at least September 17, 2019 through February 9, 2020 (the "relevant period"), Silver Point participated in the confidential mediation as a member of an "ad hoc" creditors' committee comprised of Puerto Rico bondholders.[1]

53.     During that same period, Silver Point was a signatory to a mediation agreement that obligated it to keep confidential "all Proposals, views, conduct, and statements made, whether oral or written, and any information, or graphic or physical evidence offered in the course of the mediation (or in advance of the mediation if so designated)." The agreement warned that "there are applicable securities laws or regulations that may, depending on the circumstances, prohibit the purchase and sale of securities by persons who possess MNPI."

54.     Fortgang was Silver Point's sole representative in the confidential mediation for most of the relevant period. On Silver Point's behalf, he attended mediation sessions and participated in calls with other creditors, the mediator, and representatives of Puerto Rico, offering Silver Point's perspective on the economic terms of any deal and serving as its primary negotiator. He also received settlement proposals circulated amongst the parties and nonpublic information about Puerto Rico's financial position—much of which constituted MNPI and was marked as such.

55.     Silver Point assigned Fortgang to this role (rather than a public side analyst well-versed in Puerto Rico bonds), so that its public side could rely on the information barrier to continue to trade Puerto Rico bonds while the mediation was ongoing (and while Silver Point had MNPI about Puerto Rico bonds).

---

[1] Ad hoc creditors' committees (in contrast to official creditors' committees that are established pursuant to the Bankruptcy Code) are self-formed groups of creditors that coordinate amongst themselves and with the debtor on the implementation of a restructuring. Ad hoc committees, like official committees, seek to influence the outcome of a bankruptcy case in favor of similarly situated creditors.

56. Silver Point's use of an information barrier and continued trading in Puerto Rico bonds while it was in possession of MNPI about Puerto Rico bonds (through Fortgang) was unique amongst the many other hedge fund participants to the mediation. Other hedge funds involved in the mediation flatly prohibited their employees from trading in Puerto Rico bonds when they had MNPI from the mediation.

57. Unbeknownst to the other participants in the mediation, the barrier policy that Silver Point was relying on to trade was not enforced as to Fortgang, even though he was Silver Point's representative and had received MNPI from the mediation.

58. For example, on September 17, 2019, Fortgang, alone, attended the first Puerto Rico mediation session on behalf of Silver Point and received MNPI about the risks associated with Puerto Rico's fiscal plan. Following the session, Compliance correctly added Puerto Rico to Silver Point's watch list based on Fortgang's receipt of MNPI.

59. <u>During</u> that confidential mediation session, Fortgang had a seven-minute call with a member of Silver Point's public side. Silver Point's barrier policy required that Compliance be alerted to the call. It was not. Because the call was not preapproved, Compliance was unable to determine whether it needed to be monitored and entered on the wall crossing log to ensure daily monitoring of trading in Puerto Rico bonds thereafter.

60. Later that same day, the relevant members of Silver Point's public side approved a trading recommendation to purchase approximately $14.5 million Puerto Rico bonds.

61. Further, on September 19, 2019, Fortgang was present in Silver Point's Greenwich, Connecticut office. Silver Point's barrier policy required actual physical separation between the public and private sides in the office. Despite this, Fortgang was permitted to move unimpeded throughout the office, specifically including spaces where public side employees

13

worked—even sit next to the traders while they placed trades—without any oversight by Compliance, in contravention of the barrier policy.

62. Then, on September 20, 2019, Compliance improperly removed Puerto Rico bonds from the watch list, despite Fortgang still possessing MNPI from his attendance at the September 17, 2019 mediation session. As a result, subsequent trading in Puerto Rico bonds was not subject to the enhanced daily surveillance required by the barrier policy until it was added back to the watch list on October 25, 2019. In fact, Silver Point made 11 purchases of Puerto Rico bonds on four different days, in amounts totaling over $46 million, during that 5 ½ week period.

63. Fortgang continued to possess MNPI until at least October 17, 2019, when that information was released to the public (and thus no longer constituted MNPI). Despite this, between September 17 and October 17, Fortgang had at least 123 calls with 11 different members of Silver Point's public side, including four calls with the primary analyst who covered Puerto Rico and recommended trades in Puerto Rico bonds and 15 calls with the executive who approved those trading recommendations. The barrier policy required that Compliance be alerted to these calls ahead of time and, depending on the nature of the calls, also log and monitor the calls, yet none of these things happened.

64. Between October 25, 2019 and February 9, 2020, Fortgang received additional MNPI in connection with the confidential mediation, including settlement offers exchanged by the parties on October 25, October 30, November 5, November 7, November 8, December 16, and December 30. Fortgang also attended in-person mediation sessions on November 5, 2019 and December 16, 2019 at which MNPI was exchanged.

65. During this same period, Fortgang had at least 394 calls with 17 different members of Silver Point's public side, including 36 calls with the primary analyst who recommended trades in Puerto Rico bonds and 22 calls with the executive who approved Puerto Rico bonds trading recommendations.

66. For instance, on November 5, 2019, while Fortgang was physically present in a mediation session and had just received MNPI in the form of a settlement offer by Puerto Rico, Fortgang called the primary analyst who covered Puerto Rico. The two spoke for two minutes. The analyst, in requesting the call, knew Fortgang was attending the mediation session and that MNPI would have been exchanged at the start of the mediation session, yet neither he nor Fortgang alerted Compliance, in contravention of the barrier policy.

67. Indeed, the barrier policy required Compliance to preapprove all 394 calls between Fortgang and the public side and, potentially, monitor and log them as well. However, none of the calls were preapproved, much less monitored or logged by Compliance. As a result, the nature and substance of the calls is unknown.

68. In addition, on December 3, 2019, while Fortgang was still in possession of MNPI learned during the October and November 2019 negotiations, he twice called the same analyst who covered Puerto Rico bonds. Later that afternoon, the analyst sent a draft trading recommendation to his supervisor. The next day, Fortgang again called the analyst and the two spoke for four minutes. Under the barrier policy, Compliance should have been alerted to each of these calls in advance, but it was not.

69. A few hours later, the analyst circulated a final trading recommendation to purchase additional Puerto Rico bonds. The recommendation was approved the same day, and,

between December 4 and December 12, Silver Point bought more than $54 million Puerto Rico bonds.

70. On December 12, 2019, Fortgang was again in Silver Point's office. While Fortgang was present in the office, but not subject to the public/private physical separation required by the barrier policy, the public side analyst responsible for covering Puerto Rico bonds circulated a "TIME SENSITIVE" trading recommendation to purchase additional Puerto Rico bonds. The recommendation was approved the following day, and Silver Point then bought a total of over $18 million of Puerto Rico bonds.

71. As exemplified above, Silver Point's barrier policy, which merely provided generally that consultants such as Fortgang "may" be subject to it, failed to address an obvious risk inherent in its business model—Fortgang's possession of MNPI from participating on creditors' committees on behalf of Silver Point for more than 17 years and his untrammeled access to the public side with no oversight, or even notice to the Compliance staff responsible for oversight.

72. Silver Point neither established nor enforced the barrier policy as to Fortgang. As a result, there was a substantial risk that Fortgang would, advertently or inadvertently, pass MNPI about an entity to the public side of Silver Point, thus influencing its trading decisions. Whether Fortgang *in fact* ever passed MNPI to the public side is impossible to know, precisely because of Silver Point's failures.

73. Silver Point executed a statute of limitations tolling agreement with the Commission on July 29, 2024, tolling the statute of limitations period for 90 days.

## FIRST CLAIM FOR RELIEF
### Violation of Section 204A of the Advisers Act

74. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

75. At all times relevant to the Complaint, Defendant, while acting as an investment adviser, failed to establish, implement, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent the misuse in violation of the Advisers Act  [15 U.S.C. § 80b-1 et seq.], or the Securities Exchange Act of 1934  [15 U.S.C. § 78a et seq.], or the rules or regulations thereunder, of material nonpublic information by such investment adviser or any person associated with such investment adviser.

76. By reason of the foregoing, Defendant violated Section 204A of the Advisers Act [15 U.S.C. § 80b-4a].

## SECOND CLAIM FOR RELIEF
### Violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 Promulgated Thereunder

77. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

78. At all times relevant to the Complaint, Defendant, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, while acting as a registered investment adviser that provided advice to clients, failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder.

79. By reason of the foregoing, Defendant violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-7 thereunder [17 CFR § 275.206(4)-7].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining, pursuant to Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)], Defendant and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Advisers Act Sections 204A and 206(4) [15 U.S.C. §§ 80b-4a, 80b-6], and Rule 206(4)-7 [17 CFR § 275.206(4)-7] thereunder;

**II.**

Ordering Defendant to pay civil monetary penalties under Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

**III.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Dated: December 20, 2024              Respectfully submitted,

*/s*
Susan R. Cooke (D.C. Bar No. 978173)
Michael C. Moran (CT phv08741, Mass. Bar No. 666885)
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
CookeS@sec.gov
MoranMi@sec.gov
Cooke phone: (617) 573-4538
Moran phone: (617) 573-8931
Facsimile: (617) 573-4590

*Counsel for Plaintiff Securities and Exchange Commission*