UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-02018-SVN |
| | ) | |
| SILVER POINT CAPITAL, L.P. | ) | February 18, 2025 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ANSWER OF DEFENDANT SILVER POINT CAPITAL, L.P.

Defendant Silver Point Capital, L.P. ("Silver Point" or "Defendant"), by and through undersigned counsel, hereby answers and asserts affirmative defenses to Plaintiff Securities and Exchange Commission's ("SEC" or "Plaintiff") Complaint (the "Complaint") and reserves its rights to request dismissal of the Complaint on any and all grounds. Unless expressly admitted, all of the allegations set forth in the Complaint are denied.[1]

## PRELIMINARY STATEMENT

1.      In its Complaint, the SEC does not allege any illegal trading, unethical acts, or any harm to investors. Instead, the SEC's Complaint advances an untenable and novel legal theory—that Silver Point's industry-leading policies and procedures regarding material non-public information ("MNPI") were not reasonably designed because, and only because, they did not include a bespoke written policy governing the behavior of Chaim Fortgang, a prominent

---

[1] Silver Point denies all titles, headings, footnotes, subheadings, and any other material not contained in numbered paragraphs unless otherwise noted. When a document (or statements, conclusions, or other material references therefrom) is referenced in this Answer or the Complaint, it speaks for itself and Silver Point denies any allegations or characterizations based on the document. Silver Point reserves all rights with regard to the existence, authenticity, accuracy, and admissibility of such documents.

bankruptcy attorney, who died over three years ago.  This theory rests on the SEC's mischaracterization of Fortgang's role—specifically, that he should have been treated under Silver Point's policies as a private side investment analyst rather than as a lawyer (which, by all accounts, was his sole role).  This theory is inconsistent with all of the evidence, including contemporaneous communications, Silver Point's records, and the perspectives of all of the Silver Point employees who testified in the SEC's lengthy investigation and the numerous lawyers who interacted with Fortgang when he worked with Silver Point, all of which show that he was functioning exclusively as a lawyer.  Against this backdrop of overwhelming evidence, which includes statements and testimony from twenty-two (22) witnesses presented during the course of the SEC's investigation, the SEC has not identified a single witness who could provide any contrary testimony.

2.    Despite Fortgang's over 40-year career as a bankruptcy attorney, including his 15-year representation of Silver Point in a variety of bankruptcy-related legal matters, the SEC's far-fetched theory of noncompliance is based solely on Fortgang's actions in a single court-ordered mediation in late 2019 and early 2020.  And, even in that one mediation, by all accounts, Fortgang operated in an entirely conventional manner for a bankruptcy and restructuring lawyer.  The SEC's theory is premised on the idea that there was substantial risk Fortgang would leak MNPI from this mediation when there was not any risk given his sophistication, experience, knowledge of Silver Point and its information barrier, his contractual obligations to Silver Point, and his legal and ethical obligations as an attorney.

3.    **Silver Point Capital, L.P.**  Silver Point is a registered investment adviser based in Greenwich, Connecticut.  Silver Point was founded in 2002 and has approximately 290 employees and approximately $29 billion in assets under management (as of December 31,

2023).  Silver Point and its affiliates have discretionary trading authority for private accounts and pooled investment vehicles, with a specialization in debt investing.  As part of its overarching investment strategy, Silver Point participates in bankruptcy and restructuring processes when holding significant credit positions in a debtor.

4.      **The Information Barrier.**  Since its inception, Silver Point has implemented an information barrier policy (the "Information Barrier") to facilitate its investment activities.  The Complaint details, at length, the significant and extensive safeguards implemented by Silver Point in connection with its Information Barrier, and these policies have been tested and reviewed by numerous external counsel and compliance advisors.  Information barriers like Silver Point's allow distressed debt investors to provide valuable input as significant creditors during the restructuring process while unrestricted employees continue trading activities.  Both the SEC and bankruptcy courts have long recognized the validity and acceptability of information barriers, as well as the benefits of having large creditors participate in restructurings while not placing restrictions on trading by employees who are not receiving MNPI.

5.      Silver Point's Information Barrier imposes controls and obligations on employees, who are sorted into three categories.  First, "Public Employees" (also referred to as the "Public Side") are generally responsible for monitoring and trading securities and other instruments.  Second, "Private Employees" (also referred to as the "Private Side") work on, among other things, sourcing and evaluating direct lending opportunities and on reorganizations and restructurings of existing Silver Point positions.  Third, "Administrative Employees," which include the General Counsel, Chief Compliance Officer, Chief Financial Officer, and their staffs, provide operational support.  Silver Point's industry-leading Information Barrier was reasonably

designed to address the risks of its business, and it did not apply to outside attorneys, consistent with industry-standard practice.

6.     As the Complaint acknowledges, Silver Point has dedicated significant resources to implement and enforce its strict Information Barrier, which includes, among other things, physical and electronic separation of the "Public Side" and "Private Side;" a restricted list and watch list for preventing and monitoring trades in specific securities; and "wall crossing" procedures for monitoring, approving, surveilling, and documenting Public-Private Employee conversations.  This separation between Public and Private Employees is designed so that the Public Side is insulated from any MNPI possessed by the Private Side due to its involvement in restructuring discussions, and it therefore allows the Public Side to continue trading securities even when the Private Side possesses MNPI.  The SEC does not criticize any of Silver Point's extensive Information Barrier policies or procedures or make any allegations regarding any attorneys or consultants, other than Fortgang.

7.     **The Investigation.**  The SEC initiated the investigation preceding the Complaint over four years ago, in November 2020, as part of a larger inquiry into trading in Puerto Rico securities.  The investigation, at least as to Silver Point, was focused on Silver Point's trading in certain bonds issued by the Commonwealth of Puerto Rico between September 2019 and February 2020.  Silver Point was cooperative throughout the investigation, including producing over 340,000 documents to the SEC and making nine current and former employees available to provide testimony.  Moreover, Silver Point took the extraordinary step of voluntarily waiving the attorney-client privilege over requested documents and information to make clear to the SEC the legality and appropriateness of all of Silver Point's conduct.  Following this lengthy investigation and Silver Point's voluntary privilege waiver, the Commission did not identify any trading based

4

on MNPI, any defrauded or harmed investors, or any other illegal or unethical conduct. The SEC's allegations solely relate to the narrow, misguided theory regarding a purported policies and procedures violation, as outlined in the Complaint.

8.    **Chaim Fortgang.**  Until his death in 2021, Silver Point maintained a longstanding attorney-client relationship with Chaim Fortgang, a prominent bankruptcy attorney. Fortgang had worked at Wachtell, Lipton, Rosen, & Katz LLP for over 30 years, serving as the head of the firm's Corporate Restructuring and Creditors' Rights practice.  In 2004, Fortgang left Wachtell to found Fortgang Consulting LLC and began providing advice on bankruptcy law, predominantly but not exclusively to Silver Point, as an outside legal consultant.  While carefully omitted from the Complaint, Fortgang was an active, New York-licensed attorney at all times relevant to the SEC's Complaint.  Further, Silver Point treated Fortgang in all respects as outside counsel, including identifying his expenses as "legal expenses" on Silver Point's books and records and relying on his legal advice and treating it as privileged for all purposes.  In addition, just like other outside counsel representing Silver Point, Fortgang represented Silver Point in court and received and responded to legal confirmation letters from PricewaterhouseCoopers, Silver Point's outside auditors.

9.    Silver Point retained Fortgang through Independent Contractor Agreements (the "Agreements"), which were renewed on a 1–2 year basis and specified that he would "provide advice to the Company regarding transactions in which the Company is or may become involved, and bankruptcy and restructuring related matters generally, in each case as requested by the Company [*i.e.*, Silver Point]."  The Agreements also required Fortgang "to comply with all of the Company's compliance policies and procedures including, without limitation, the Company's Information Barrier Policies and Procedures, and the other policies and procedures

as described in the Company's Compliance Manual and Code of Ethics," meaning he was required to ensure that any MNPI he possessed was not shared with the Public Side. Additionally, Fortgang acknowledged in the Agreements that he "owe[d] a duty to the Company not to, directly or indirectly, make known, disclose, furnish, make available or utilize any Confidential Information, other than in the proper performance of [his] obligations hereunder for the benefit of the Company." Among these obligations was the obligation not to share MNPI with the Public Side in violation of the Information Barrier policy.

10.    During the course of his engagement, Fortgang's role was solely to provide legal advice. Fortgang primarily provided legal advice to the Public Side regarding a broad array of pending or potential bankruptcy matters, but he also advised the Private Side and represented Silver Point (as an attorney) in private negotiations. The testimony of current and former Silver Point employees, testimony from the ad hoc committee group counsel who represented Silver Point and other creditors in connection with the Puerto Rico bankruptcy, Silver Point's contemporaneous communications, Silver Point's accounting records, and the recollections of prominent bankruptcy counsel who dealt with Fortgang when he was representing Silver Point all prove that Fortgang exclusively functioned as an attorney when working for Silver Point. The SEC's Complaint ignores all of this evidence, likely because it cannot be reconciled with its false narrative.

11.    Silver Point is a longstanding owner of Puerto Rico municipal bonds, with positions in certain bonds in the complex dating back to at least 2013. In 2018, Silver Point joined an ad hoc creditors' committee, the Ad Hoc Group of Constitutional Debtholders, with other creditors who were invested in General Obligation bonds issued by the Commonwealth of Puerto Rico (the "GO bonds"). In 2019, there was a court-ordered mediation related to the GO

bonds (the "mediation"). Prior to the mediation beginning, Silver Point, through its work with counsel (including Fortgang), developed a fundamental view regarding the value of the GO bonds (in court-adjudicated or settlement scenarios). The SEC's allegations ignore the evidence demonstrating that this fundamental view did not change throughout the mediation and drove Silver Point's trading during the relevant period.

12.     The Complaint suggests Fortgang's role in the mediation, standing alone, somehow transformed him into a Private Side employee. In reality, Fortgang acted in a traditional legal role and did not perform any function that would warrant classifying him as an employee, Public or Private. Silver Point requested Fortgang's legal representation in the mediation because the mediation primarily concerned how recovery value could be allocated in a potential settlement between late vintage and earlier vintage bonds based on esoteric legal arguments and distinctions, including the debtor's public legal argument that late vintage bonds were issued in violation of the Commonwealth's constitutional debt service limit and bondholders' legal arguments that bonds with the alleged defects could not be retroactively nullified (*e.g.*, in light of investors' reliance on public disclosures and certifications in bond documents and resolutions that the bonds were not defective, investor protections in the Uniform Commercial Code, and because invalidation would violate principles of equity). Because Silver Point was significantly overweight in the late vintage bonds that were being challenged, Silver Point needed a savvy, respected and highly intelligent attorney to advocate for its legal position; there was no one better equipped for that role than Fortgang.

13.     Indeed, attending mediation on behalf of a client, and analyzing legal arguments relevant to the mediation, are functions routinely performed by bankruptcy counsel and were equally undertaken by the Ad Hoc Group counsel representing Silver Point, Morrison &

Foerster. The SEC has never suggested that communications with Morrison & Foerster—or any other outside counsel performing the same or similar functions—should be monitored by a firm's internal compliance department.

14.     Because he was functioning as an attorney, there was no obligation for Fortgang to be chaperoned by Silver Point Compliance personnel in his discussions with the Public Side. Indeed, the monitoring of conversations with outside counsel who possess MNPI is not even a question of a firm's information barrier, as the same issue is faced by all firms (whether or not they have such a barrier). We are not aware of any investment manager or other firm that requires chaperoning of in-house or outside counsel, even when such counsel is in possession of MNPI, since it is recognized that counsel have independent ethical duties and understand their obligation not to share MNPI. The SEC does not claim otherwise. Fortgang was no different.

15.     Nor was there any risk that Fortgang would share MNPI with the Public Side. Fortgang was a sophisticated bankruptcy attorney with vast experience who understood his legal and ethical obligations. Through his Agreements with Silver Point, Fortgang was contractually obligated to ensure compliance with the securities laws and maintain the integrity of Silver Point's Information Barrier.

16.     Further, as an attorney, Fortgang was bound by professional responsibilities and ethical duties to handle MNPI appropriately. In addition to the restrictions imposed by the federal securities laws, Fortgang also had independent ethical responsibilities under the New York Rules of Professional Conduct that prevented him from improperly disclosing MNPI to his clients, including Silver Point. The Complaint contains no allegations that Fortgang, during his long and illustrious career, violated or even potentially violated his professional or ethical obligations as an attorney with respect to his work for any client.

8

17.     The Complaint references numerous calls that Fortgang had with the Public Side while he possessed MNPI relevant to the Puerto Rico GO bonds.  The evidence shows that (i) any unmonitored investment-related discussions concerned matters other than the Puerto Rico GO bond mediation, and (ii) that, to the extent such calls related to the confidential GO bond mediation, they were, in fact, monitored and logged by Silver Point Compliance personnel, out of an abundance of caution and pursuant to an established compliance procedure.  It is commonplace for lawyers, particularly bankruptcy and restructuring lawyers, to speak with clients on matters about which they have MNPI—without compliance chaperoning and without disclosing such information, consistent with their legal and ethical obligations.  Silver Point's procedures, however, went above and beyond industry practice and any regulatory requirements.  Consistent with those procedures, both Fortgang and the relevant analysts properly sought and obtained Compliance oversight over any discussions that related to the confidential Puerto Rico GO bond mediation.

18.     Section 204A requires that investment advisers "establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse" of MNPI.  Rule 206(4)-7 similarly requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Investment Advisers Act and associated regulations.

19.     The only express requirement embodied in these provisions is that a firm's policies and procedures must be "reasonably designed."  The standards require simply that the policies and procedures competently address the risks posed by the firm's specific business operations.  Fortgang was functioning as an attorney, had independent legal and ethical

obligations not to share MNPI, and Silver Point's policies and procedures were reasonably designed to address any theoretical risks posed by an attorney in his role.

20.    Put simply, it would make no sense to interpret Section 204A and Rule 206(4)-7 to require a second attorney to chaperone and re-assess the judgement of a renowned bankruptcy attorney with respect to the appropriate treatment and use of MNPI.  It was—and remains—reasonable for Silver Point to trust its counsel to act responsibly and professionally when in possession of MNPI—and this was especially true in the case of Fortgang.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS

**1.    Silver Point, as a registered investment adviser, was required by law to establish, implement, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent the misuse of material nonpublic information ("MNPI"). However, Silver Point's policies and procedures were not reasonably designed to address the risks associated with its specific business model. Further, Silver Point failed to enforce the policies and procedures it did have as to a Silver Point consultant who had routine access to MNPI. These failures allowed for a largely unfettered, unmonitored flow of information from the consultant to Silver Point's public trading side.**

**ANSWER:**    The allegations in paragraph 1 contain characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations, except admits that Silver Point is a registered investment adviser subject to applicable securities laws.

**2.    As an investment adviser that manages hedge funds, one of Silver Point's core business strategies is investing in bankrupt or distressed entities that were struggling to make payments on debt they had issued. To execute this strategy, Silver Point was organized into two sides: the "public side" and the "private side." The public side actively bought and sold the debt of the distressed entity. The private side participated as a creditor/investor in confidential negotiations over how the distressed entity could repay its debt, often receiving MNPI in those negotiations. From 2004 to 2021, and specifically in 2019 and 2020, Silver Point consultant Chaim Fortgang served as Silver Point's private side representative in these confidential negotiations.**

**ANSWER:**    Silver Point denies the allegations in paragraph 2, except admits that Silver Point is an investment adviser specializing in debt investing, maintains an information barrier

designating employees as "Public Side," "Private Side," or "Administrative" and that these employees have distinct roles and responsibilities, and retained Chaim Fortgang as a legal consultant from 2004 until his death in 2021.

**3.     This public/private business model presented a substantial risk that information from the confidential negotiations would leak from the private side to the public side and then be misused in trading decisions. To prevent leakage of MNPI from its private side to its public side, Silver Point purported to rely on an information barrier between the two sides. However, Silver Point's written policies and procedures establishing the information barrier were not reasonably designed in light of its public/private business model and Fortgang's role at Silver Point. Further, the information barrier was not implemented as to Fortgang to prevent the misuse of the MNPI he had from his work for Silver Point.**

**ANSWER:**     The allegations in paragraph 3 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations, except admits it employed policies and procedures concerning material non-public information ("MNPI"), including but not limited to its formal Information Barrier.

**4.     Through this action, the Commission seeks a civil penalty and a permanent injunction prohibiting the Defendant from further violations of the relevant provisions of the federal securities laws.**

**ANSWER:**     The allegations in paragraph 4 describe Plaintiff's prayer for relief as to which no response is required. To the extent any response is necessary, Silver Point denies that it has engaged in any violation of law and denies that Plaintiff is entitled to any relief whatsoever.

## I.     VIOLATIONS

**5.     By virtue of the foregoing conduct and as alleged further herein, Silver Point has violated Sections 204A and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C §§ 80b-4a; 80b-6] and Rule 206(4)-7 promulgated thereunder [17 CFR § 275.206(4)-7].**

**ANSWER:**     The allegations in paragraph 5 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations.

**6.** **Unless Silver Point is enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.**

**ANSWER:** The allegations in paragraph 6 are legal conclusions and predictions about future behavior to which no response is required. To the extent any response is necessary, Silver Point denies the allegations.

## II. NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

**7.** **The Commission brings this action pursuant to the authority conferred upon it by Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d), 80b-9(e)].**

**ANSWER:** The allegations in paragraph 7 are legal conclusions to which no response is required. To the extent any response is necessary, Silver Point denies that it has engaged in any violation of law and refers the Court to 15 U.S.C. §§ 80b-9(d), 80b-9(e) for the true and accurate content of these provisions.

**8.** **The Commission seeks a final judgment: (a) permanently enjoining Silver Point from violating the Advisers Act laws and rules pursuant to Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)]; (b) ordering Silver Point to pay a civil money penalty pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (c) ordering any other and further relief the Court may deem just and proper.**

**ANSWER:** The allegations in paragraph 8 describe Plaintiff's prayer for relief as to which no response is required. To the extent any response is necessary, Silver Point denies that it has engaged in any violation of law and denies that Plaintiff is entitled to any relief whatsoever.

## III. DEFENDANT

**9.** **Silver Point Capital, L.P. is a hedge fund manager based in Greenwich, Connecticut. It has been registered with the SEC as an investment adviser since 2012. In its Form ADV Part 2A, filed in March 2024, Silver Point reported that it had assets under management of $28.9 billion.**

**ANSWER:** Silver Point admits the allegations in paragraph 9, except avers that it is an investment adviser and not a hedge fund manager.

## IV.  RELEVANT INDIVIDUAL

**10.    Chaim Fortgang ("Fortgang"), deceased, was a resident of Brooklyn, New York. An ex-big law partner, Fortgang was a well-known bankruptcy attorney during his legal career. He worked for Silver Point from at least 2004 to October 2021 pursuant to a series of consulting agreements.**

**ANSWER:**    Silver Point admits, upon information and belief, that Fortgang was a resident of Brooklyn, New York, who was a well-known bankruptcy attorney and former partner and head of the Corporate Restructuring and Creditors' Rights practice at the law firm Wachtell, Lipton, Rosen & Katz, LLP.  Silver Point admits Fortgang was a licensed attorney and served as legal counsel to Silver Point, as well as other clients, from 2004 until his death in October 2021, pursuant to consulting agreements.  Silver Point otherwise denies the allegations in paragraph 10.

## V.  JURISDICTION AND VENUE

**11.    This Court has jurisdiction over this action pursuant to Advisers Act Sections 209(d), 209(e), and 214(a) [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14(a)].**

**ANSWER:**    The allegations in paragraph 11 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point admits that this Court has jurisdiction over this matter.

**12.    Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.**

**ANSWER:**    The allegations in paragraph 12 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point admits that, as part of its business, it has made use of the means and instrumentalities of interstate commerce.

13.    **Venue lies in this District under Advisers Act Section 214(a) [15 U.S.C § 80b-14(a)]. Defendant may be found in, is an inhabitant of, or transacts business in the District of Connecticut, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.**

**ANSWER:**    The allegations in paragraph 13 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations, except admits that its principal office and place of business is in Greenwich, Connecticut.

## VI.  BACKGROUND

### A.  Silver Point's Business Model Posed a High Risk of Misuse of MNPI and Its Procedures Did Not Address that Risk

14.    **All investment advisers, like Silver Point, are required by law to establish, implement, and enforce written policies and procedures that are reasonably designed to prevent the misuse of MNPI. These policies and procedures must take into consideration the nature of the adviser's business, including the circumstances under which the adviser receives MNPI.**

**ANSWER:**    The allegations in paragraph 14 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies that it has engaged in any violation of law and refers the Court to the Investment Advisers Act of 1940, codified at 15 U.S.C. §§ 80b-1-80b-21, for the true and accurate content of these provisions.  Silver Point admits that it is required by law to establish policies and procedures reasonably designed to prevent the misuse of MNPI, and it has therefore designed and implemented, among other policies and procedures, an industry-leading information barrier policy.

15.    **Silver Point's business model is heavily focused on investing in distressed debt.**

**ANSWER:**    Silver Point denies the allegations in paragraph 15, except admits that Silver Point specializes in debt investing.

     **16.**     **Since at least 2004, Silver Point divided its business between a "public side" and a "private side."**

**ANSWER:**    Silver Point denies the allegations in paragraph 16, except admits that Silver Point maintains an information barrier designating employees as "Public Side," "Private Side," or "Administrative."

     **17.**     **As relevant here, the public side invested in the debt markets for the funds that Silver Point managed. It consisted of analysts that researched distressed entities and made recommendations to buy and sell securities issued by those same entities, a group that considered and approved the trading recommendations, and traders that executed the trades.**

**ANSWER:**    Silver Point denies the allegations in the first sentence of paragraph 17, except admits that Silver Point has invested in distressed debt.  The allegations in the second sentence of paragraph 17 are denied, except Silver Point admits that certain Public Side employees conduct analysis and make recommendations to buy and sell securities, certain Public Side employees consider and may approve those recommendations, and certain Public Side employees execute approved trades.

     **18.**     **Once Silver Point was an investor or holder of debt in a distressed entity, it often joined the confidential negotiations aimed at crafting a repayment plan or restructuring by the distressed entity. Creditors with similar holdings or interests frequently teamed up to form creditors' committees for purposes of the negotiations.**

**ANSWER:**    Silver Point denies the allegations in the first sentence of paragraph 18, except admits that it has, at times, participated in confidential negotiations associated with bankruptcy and restructuring processes related to its investments.  Silver Point lacks sufficient knowledge to either admit or deny the allegations in the second sentence of paragraph 18 as to the "frequent" conduct of other creditors, and the allegations are otherwise denied.

19.     **Silver Point typically sent representatives from its private side to sit on creditors' committees. The role of the private side representatives was to advocate for advantageous recoveries for the distressed debt Silver Point was holding and/or concurrently trading.**

**ANSWER:**     Silver Point denies the allegations in paragraph 19, except admits that certain

Private Side employees, at times, participate in activities in connection with Silver Point's

membership on ad hoc bankruptcy creditors' committees.

20.     **Members of these creditors' committees routinely exchanged MNPI with the debtor and/or become aware of MNPI during these confidential negotiations, upon which it would be illegal to trade. In the context of restructuring proceedings, MNPI concerning the parties' negotiating positions, proposed settlement terms, or the debtor's financial condition and ability to pay was highly valuable information for investors looking to trade in securities of the distressed entities.**

**ANSWER:**     Silver Point denies the allegations in paragraph 20, except admits that the

bankruptcy and restructuring processes in which Silver Point has participated have, at times,

involved the exchange of MNPI between parties.

**B.  Silver Point Routinely Used Fortgang to Receive MNPI on its Behalf**

21.     **In 2004, Fortgang began working for Silver Point pursuant to a written agreement that identified him as a consultant. Prior to joining Silver Point, Fortgang practiced bankruptcy law for decades and was widely known in the bankruptcy bar. He had a reputation for being aggressive and uncompromising while advocating on behalf of his clients.**

**ANSWER:**     Silver Point denies the allegations in the first sentence of paragraph 21, except

admits that Silver Point retained Fortgang, at all times relevant to the Complaint a licensed New

York attorney, beginning in 2004.  To the extent that paragraph 21 purports to quote,

characterize, or summarize a written agreement, the document speaks for itself, and Silver Point

respectfully refers the Court to the full text of the document for its true and accurate contents.

Silver Point admits the allegations in the second sentence of paragraph 21.  The allegations in the

third sentence of paragraph 21 contain ambiguous terms to describe Fortgang's alleged

"reputation" among an unidentified group (such as "aggressive" and "uncompromising"), but to

the extent any response is required, Silver Point denies the allegations, except admits that

Fortgang provided experienced, sophisticated, and knowledgeable legal counsel to Silver Point.

**22.     Fortgang worked almost exclusively for Silver Point as a consultant from 2004 until his death in 2021. Although his consulting agreement with Silver Point permitted him to work as a consultant to other entities, he rarely did so. In those rare instances, Fortgang was required to notify Silver Point before doing so—giving Silver Point the right to decide whether such outside work would present a conflict or interfere with Fortgang's work for Silver Point.**

**ANSWER:**     Paragraph 22 contains ambiguous terms (such as "almost exclusively" and

"rare"), but to the extent any response is required, Silver Point denies the allegations in

paragraph 22, except admits that Fortgang, at all times relevant to the Complaint a licensed New

York attorney, was engaged by Silver Point from 2004 until his death in 2021 and, at times,

provided legal services to other clients during this period.  To the extent that paragraph 22

purports to quote, characterize, or summarize a written agreement, the document speaks for

itself, and Silver Point respectfully refers the Court to the full text of the document for its true

and accurate contents.

**23.     Silver Point paid Fortgang a flat, monthly consulting fee of $183,333—irrespective of hours worked or work product. Fortgang also was eligible for a discretionary, year-end bonus. Although Silver Point solicited feedback on his performance from various public and private side employees who worked with Fortgang, his bonus was determined by the executive who approved trading recommendations for Silver Point, with no objective rating criteria.**

**ANSWER:**     Silver Point denies the allegations in paragraph 23 and instead avers that

Fortgang's compensation was governed by written agreement.  To the extent that paragraph 23

purports to quote, characterize, or summarize a written agreement, the document speaks for

itself, and Silver Point respectfully refers the Court to the full text of the document for its true

and accurate contents.

24.     **Silver Point employed Fortgang to advise both its public and private sides on issues that arose in connection with Silver Point's investments and related restructurings. At times, he was copied on trading recommendations made by Silver Point's public side analysts.**

**ANSWER:**     Silver Point denies the allegations in paragraph 24, except admits that Fortgang provided legal advice to Silver Point, including Public Side and Private Side employees, on various issues concerning matters of bankruptcy law, and at times may have received emails related to his provision of legal services.  To the extent that paragraph 24 purports to quote, characterize, or summarize communications, the documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents.

25.     **His work on behalf of Silver Point also included sitting on creditors' committees, where he routinely received MNPI and engaged in negotiations on the terms of various bankruptcy restructurings. Often, Fortgang was Silver Point's sole representative on these creditors' committees.**

**ANSWER:**     Silver Point denies the allegations in paragraph 25, except admits that Fortgang, at times, received MNPI in connection with this work.

C.  **Silver Point Relied on Its Information Barrier to Satisfy Its Obligations as an Investment Adviser and Still Trade While in Possession of MNPI**

26.     **To enable Silver Point's public side to actively trade the debt of a distressed entity while the private side simultaneously participated in confidential negotiations (and received MNPI) about the same entity, Silver Point purported to adhere to an information barrier between the two sides.**

**ANSWER:**     Silver Point denies the allegations in paragraph 26, except admits that it implemented and in all relevant instances complied with an information barrier to facilitate its investment activities.

**27.    The information barrier's design and implementation were critical to satisfying Silver Point's legal obligations to establish, implement, and enforce written policies and procedures reasonably designed to prevent the misuse of MNPI.**

**ANSWER:**    The allegations in paragraph 27 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 27 except admits that Silver Point designed, implemented, and in all relevant instances complied with an information barrier.

**28.    Silver Point's Compliance Manual contained the Information Barrier Policies and Procedures (the "barrier policy") that dictated how the barrier should function.**

**ANSWER:**    Silver Point denies the allegations in paragraph 28, except admits that Silver Point's Compliance Manual contained, at all relevant times, a section titled "Information Barrier Policies and Procedures."  To the extent that paragraph 28 purports to quote, characterize, or summarize the policies and procedures in Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.

**29.    The barrier policy, which remains in effect, applied to all "Silver Point directors, officers, partners, employees, temporary employees and any other affiliated persons designated by [the Compliance department] (which may include consultants, independent contractors and certain other persons)" [emphasis added]. It required that Silver Point's Legal and Compliance Department ("Compliance" or "Compliance Department") designate each of these covered individuals as either public, private, or administrative, which then determined the level of surveillance and other oversight warranted by Compliance to prevent the leakage of MNPI.**

**ANSWER:**    To the extent that paragraph 29 purports to quote, characterize, or summarize the policies and procedures in Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 29.

**30.     For example, certain communications between public and private employees were subject to enhanced monitoring, surveillance, and logging requirements by Compliance. The central requirement of the barrier policy was that any private side employee who wanted to communicate with a public side employee (or vice versa) about <u>any</u> investment-related matter (*i.e.*, not strictly personal or administrative) must first inform Compliance. Such preapproval was required regardless of whether the private side possessed "Confidential Information," which included, but was not limited to, MNPI. Such a communication between the public and private sides was referred to as a "wall crossing."**

**ANSWER:**     To the extent that paragraph 30 purports to quote, characterize, or summarize the

policies and procedures in Silver Point's Compliance Manual, the document speaks for itself,

and Silver Point respectfully refers the Court to the full text of the document for its true and

accurate contents.  To the extent any response is required, Silver Point denies the allegations in

paragraph 30.

**31.     Per the barrier policy, the employee seeking preapproval of the proposed wall crossing was required to provide Compliance with certain information, including the participants, the name of the issuer to be discussed, the discussion topics, whether there was an information disparity between the public and private sides, and whether the private side had, and intended to share, Confidential Information.**

**ANSWER:**     To the extent that paragraph 31 purports to quote, characterize, or summarize the

policies and procedures in Silver Point's Compliance Manual, the document speaks for itself,

and Silver Point respectfully refers the Court to the full text of the document for its true and

accurate contents. To the extent any response is required, Silver Point denies the allegations in

paragraph 31.

**32.     When the private side had Confidential Information about an issuer but did not plan to disclose such information to the public side during a discussion about that same issuer, the barrier policy required Compliance to preapprove the communication, as described above, <u>and also</u> to monitor and log the communication. Relatedly, Compliance was required by the barrier policy to maintain a log of all wall crossings between the public and private sides to ensure daily monitoring of trading in issuers about which the private side had Confidential Information.**

**ANSWER:**     To the extent that paragraph 32 purports to quote, characterize, or summarize the

policies and procedures in Silver Point's Compliance Manual, the document speaks for itself,

and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 32.

**33.    When the private side had Confidential Information about one entity but planned to discuss a different entity with the public side about which it did not have Confidential Information, the barrier policy <u>still</u> required the employee seeking the wall crossing to inform Compliance ahead of time (with limited exception related to time-sensitivity). The barrier policy, as written, left it to Compliance's discretion whether to also monitor the communication, but it was Silver Point's professed practice to monitor and log all such communications between its public and private sides.**

**ANSWER:**    To the extent that paragraph 33 purports to quote, characterize, or summarize the policies and procedures in Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 33, except admits that Silver Point's Compliance Department personnel typically maintained a practice of monitoring and logging investment-related communications between Public Side employees and Private Side employees.

**34.    Silver Point's barrier policy also required Compliance to maintain a "watch list" and a "restricted list" to track the firm's investments and levels of knowledge. Compliance placed an issuer on the restricted list when the public side learned MNPI about that issuer. Silver Point was prohibited from trading in securities of issuers on the restricted list.**

**ANSWER:**    To the extent that paragraph 34 purports to quote, characterize, or summarize the policies and procedures in Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 34.

**35.    The watch list, on the other hand, included issuers about which only the private side had Confidential Information. This list was only accessible to Compliance because, as is explained in the barrier policy, "the very fact that Private Employees are working on a particular financing or other transaction may constitute [MNPI]." As such, Compliance's involvement in preapproving and monitoring discussions between public and private sides was critical.**

**ANSWER:**     To the extent that paragraph 35 purports to quote, characterize, or summarize the

policies and procedures in Silver Point's Compliance Manual, the document speaks for itself,

and Silver Point respectfully refers the Court to the full text of the document for its true and

accurate contents.  To the extent any response is required, Silver Point denies the allegations in

paragraph 35.

**36.    Reflecting the substantial risk in Silver Point's business model that the private side may pass MNPI to the public side, the barrier policy also dictated physical separation between the public and private sides within Silver Point's office space, with key card access required for the private side space. Private side employees were prohibited from having any investment-related conversations or meetings with, or in the physical presence of, public side employees while in the office.**

**ANSWER:**     The allegations in paragraph 36 contain characterizations and legal conclusions to

which no response is required.  To the extent that paragraph 36 purports to quote, characterize, or

summarize the policies and procedures in Silver Point's Compliance Manual, the document

speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for

its true and accurate contents.  To the extent any response is required, Silver Point denies the

allegations in paragraph 36.

**37.    Consistent with Fortgang's function at Silver Point and the heightened risk attendant to his role, he agreed to be bound by the barrier policy. Specifically, his consulting agreement mandated that he "comply with all of [Silver Point's] compliance policies and procedures, including, without limitation, the [barrier policy]...."**

**ANSWER:**     The allegations in paragraph 37 contain characterizations and legal conclusions to

which no response is required.  To the extent that paragraph 37 purports to quote, characterize, or

summarize a written agreement, the document speaks for itself, and Silver Point respectfully

refers the Court to the full text of the document for its true and accurate contents.  To the extent

any response is required, Silver Point denies the allegations in paragraph 37.

**38.      Indeed, in at least two instances, Compliance did monitor and log Fortgang's communications with public side employees, as required by the barrier policy, categorizing him as a "Private Employee" in the log. Silver Point also, at times, placed or kept an entity on its watch list (thus triggering additional monitoring) when only Fortgang had MNPI about the entity. But these few instances were the exception to the rule.**

**ANSWER:**      Silver Point denies the allegations in paragraph 38, except admits that Silver Point

personnel in the Compliance Department, at times, monitored and logged Fortgang's

communications with Public Side employees when he possessed MNPI relating to the

confidential Puerto Rico GO bond mediation and when the discussions related to such mediation.

To the extent that paragraph 38 purports to quote, characterize, or summarize Silver Point's

Compliance Manual or other documents, the documents speak for themselves, and Silver Point

respectfully refers the Court to the full text of the documents for their true and accurate contents.

Silver Point further avers that the Complaint's reference to the categorization in the log is

misleading; in each instance, the entries referenced in paragraph 38 contained text input by

Compliance personnel describing Fortgang as an outside legal consultant.

### D.  Silver Point's Policies and Procedures Were Deficient

**39.      Silver Point failed to establish and adopt written policies and procedures reasonably designed to prevent the misuse of MNPI in light of its public/private business model and Fortgang's unique and critical role within the firm.**

**ANSWER:**      The allegations in paragraph 39 contain characterizations and legal conclusions to

which no response is required.  To the extent any response is required, Silver Point denies the

allegations in paragraph 39.

**40.    Specifically, Silver Point's barrier policy did not clearly require that consultants like Fortgang, who regularly sat on creditors' committees and received MNPI, be subject to the same oversight and controls as private side employees who also sat on creditors' committees and received MNPI. Instead, Silver Point's barrier policy was, at best, ambiguous—stating only that consultants like Fortgang <u>may</u> be designated as private employees, without providing any criteria for Compliance to use to determine when to do so.**

**ANSWER:**    To the extent that paragraph 40 purports to quote, characterize, or summarize the policies and procedures in Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 40.

**41.    Silver Point's deficient policies and procedures meant Fortgang's interactions with the public side went largely unpoliced by Compliance, notwithstanding Fortgang's routine exposure to MNPI as Silver Point's creditors' committee representative, his near-constant contact with members of the public side, and the incentives created by his performance-based compensation.**

**ANSWER:**    The allegations in paragraph 41 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 41.

**E.  Silver Point Failed to Enforce the Barrier Policy as to Fortgang and His Activities**

**42.    Silver Point's enforcement of the barrier policy as to Fortgang was also deficient.**

**ANSWER:**    The allegations in paragraph 42 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 42.

43.     Based on Fortgang's role and his routine access to MNPI on Silver Point's behalf, he functioned as, and should have been designated by Compliance as, a private employee for purposes of applying the barrier policy to him. However, Silver Point failed to treat or designate him as such, notwithstanding his express agreement to be bound by the barrier policy. By not designating Fortgang as a public or private employee, Silver Point allowed Fortgang to operate in a loophole, effectively exempting him from the public/private divide that was crucial to ensuring that Silver Point did not misuse of MNPI.

ANSWER:     The allegations in paragraph 43 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 43, except admits that Fortgang, as one of Silver Point's outside attorneys, was not designated as an employee pursuant to Silver Point's policies and procedures.

44.     Silver Point also did not consistently preapprove and, where appropriate, monitor and log Fortgang's calls and in-person communications with the public side.

ANSWER:     Silver Point denies the allegations in paragraph 44, except admits that Silver Point did not require the preapproval or logging of each of Fortgang's communications with Silver Point's Public Side personnel because he was an outside attorney and his communications with the Public Side posed zero, or virtually zero, risk of MNPI misuse.

45.     Nor did Silver Point conduct email surveillance, periodic email check-ins, or trainings for Fortgang as it did for private side employees.

ANSWER:     Paragraph 45 contains ambiguous terms (such as "periodic email check-ins" and "trainings"), but to the extent any response is required, Silver Point denies the allegations in paragraph 45, except admits that Silver Point did not consider Fortgang, one of Silver Point's outside attorneys, to be a Private Side employee.

46.     Silver Point's failure to enforce its barrier policy created a substantial risk of MNPI leakage from Fortgang to the public side, and therefore a risk of illegal insider trading by Silver Point.

ANSWER:     The allegations in paragraph 46 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 46.

25

47.    **Silver Point's trading in defaulted bonds issued by the Commonwealth of Puerto Rico ("Puerto Rico bonds") underscores the risk created by Silver Point's failure to establish, implement, and enforce policies and procedures reasonably designed to prevent the misuse of MNPI.**

**ANSWER:**    The allegations in paragraph 47 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 47.

48.    **As described in more detail below, between September 17, 2019 and February 7, 2020, Silver Point purchased over $260 million of Puerto Rico bonds. Over the same period, while Fortgang was in possession of MNPI about the same Puerto Rico bonds, he had more than 500 calls with public side employees without the involvement of Compliance. At the very least, these calls should have been preapproved by Compliance pursuant to the barrier policy, so that Compliance could carry out its obligation to determine whether to approve, monitor and/or log the calls.**

**ANSWER:**    The allegations in paragraph 48 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point admits that, between September 17, 2019 and February 7, 2020, Fortgang provided legal advice to Silver Point concerning numerous matters, including concerning Puerto Rico's debt restructuring and the court-sponsored mediation relating to this issue.  To the extent any further response is required, Silver Point otherwise denies the allegations in paragraph 48.

49.    **When Silver Point sold the Puerto Rico bonds it amassed during that period, it generated profits of over $29 million.**

**ANSWER:**    Silver Point denies the allegations in paragraph 49.

50.    **Silver Point's deficient establishment and enforcement of its barrier policy as to Fortgang meant he had hundreds of opportunities to improperly share MNPI with the public side, presenting a substantial risk that Silver Point generated such profits by trading on the basis of MNPI.**

**ANSWER:**    The allegations in paragraph 50 contain characterizations and legal conclusions to which no response is required.  To the extent any response is required, Silver Point denies the allegations in paragraph 50.

51.    In 2015, the Commonwealth of Puerto Rico ("Puerto Rico") experienced a financial collapse that resulted in it defaulting on a substantial part of its outstanding debt. In June 2017, a federal bankruptcy court appointed a panel of federal judges to conduct a mediation between Puerto Rico and its creditors to reach an economic resolution on recoveries for creditor bondholders. The court order appointing the mediators specified that the participants and the mediators would be bound by confidentiality.

**ANSWER:**    To the extent that paragraph 51 purports to quote, characterize, or summarize the

June 23, 2017 Order Appointing Mediation Team, *In re Commonwealth of Puerto Rico, et al.*,

Case No. 17-3283 [Doc. No. 430] (D.P.R. 2017) (LTS), the document speaks for itself, and

Silver Point respectfully refers the Court to the full text of the court order for its true and

accurate contents.  Silver Point otherwise admits the allegations in paragraph 51.

52.    From at least September 17, 2019 through February 9, 2020 (the "relevant period"), Silver Point participated in the confidential mediation as a member of an "ad hoc" creditors' committee comprised of Puerto Rico bondholders. (FN: Ad hoc creditors' committees (in contrast to official creditors' committees that are established pursuant to the Bankruptcy Code) are self-formed groups of creditors that coordinate amongst themselves and with the debtor on the implementation of a restructuring. Ad hoc committees, like official committees, seek to influence the outcome of a bankruptcy case in favor of similarly situated creditors.)

**ANSWER:**    Silver Point denies the allegations in paragraph 52, except admits that it was a

member of the Ad Hoc Group of Constitutional Debtholders (the "Ad Hoc Group"), including

during the period between September 17, 2019 and February 9, 2020.  Silver Point further admits

that, at times, the Ad Hoc Group participated in the Puerto Rico GO bond mediation process.

53.    During that same period, Silver Point was a signatory to a mediation agreement that obligated it to keep confidential "all Proposals, views, conduct, and statements made, whether oral or written, and any information, or graphic or physical evidence offered in the course of the mediation (or in advance of the mediation if so designated)." The agreement warned that "there are applicable securities laws or regulations that may, depending on the circumstances, prohibit the purchase and sale of securities by persons who possess MNPI."

**ANSWER:**    Silver Point denies the allegations in paragraph 53, except admits that Silver Point

was a signatory to the mediation agreement filed on October 25, 2020 at Doc. No. 14920-1 in *In*

*re Commonwealth of Puerto Rico, et al.*, Case No. 17-3283 (D.P.R. 2017) (LTS).  To the extent

that it purports to quote, characterize, or summarize the written mediation agreement, the

document speaks for itself, and Silver Point respectfully refers the Court to the full text of the

document for its true and accurate contents.  Silver Point further admits that the mediation

agreement, in a section of the agreement not selectively quoted by the SEC, also provides as

follows, though Silver Point submits that the Court should, again, refer to the full text of the

document for its true and accurate contents:

> Nothing in this Agreement imposes on any Participating Party any duty to any other
> Participating Party, individually or as a group, or to any other person or entity,
> except for contractual undertakings explicitly provided for under this Agreement;
> provided that, notwithstanding the foregoing, nothing in this Agreement shall
> impose any fiduciary duty on any Participating Party. No Creditor Party (as defined
> below) is an insider of the Government.  Notwithstanding anything to the contrary
> in this Agreement, by entering into this Agreement, no Participating Party
> undertakes any duty to any person or entity to refrain from any transaction in any
> financial instrument, and it is acknowledged that any Participating Party may
> engage in such transactions as would be permitted absent this Agreement from time
> to time and at any time, subject to any applicable stay. . . .  Nothing in this
> Agreement, including any duty of confidentiality, is intended to prevent any
> Participating Party from trading any securities (or derivatives of securities) issued
> by (a) the Government; (b) monoline insurers; or (c) any other entity to which the
> Confidential Information may relate.

**54.    Fortgang was Silver Point's sole representative in the confidential mediation
for most of the relevant period. On Silver Point's behalf, he attended mediation sessions
and participated in calls with other creditors, the mediator, and representatives of Puerto
Rico, offering Silver Point's perspective on the economic terms of any deal and serving as
its primary negotiator. He also received settlement proposals circulated amongst the
parties and nonpublic information about Puerto Rico's financial position—much of which
constituted MNPI and was marked as such.**

**ANSWER:**    Silver Point denies the allegations in paragraph 54, except admits that Fortgang, at

times, participated as Silver Point's legal counsel in certain mediation sessions and Ad Hoc

Group activities concerning the Puerto Rico restructuring and that, at times, he may have

received MNPI in connection with his legal work and representation of Silver Point.

55.     Silver Point assigned Fortgang to this role (rather than a public side analyst well-versed in Puerto Rico bonds), so that its public side could rely on the information barrier to continue to trade Puerto Rico bonds while the mediation was ongoing (and while Silver Point had MNPI about Puerto Rico bonds).

ANSWER:     Silver Point denies the allegations in paragraph 55, except admits that Silver Point

tasked Fortgang, one of Silver Point's outside attorneys, among other individuals, with

representing Silver Point during the mediation.

56.     Silver Point's use of an information barrier and continued trading in Puerto Rico bonds while it was in possession of MNPI about Puerto Rico bonds (through Fortgang) was unique amongst the many other hedge fund participants to the mediation. Other hedge funds involved in the mediation flatly prohibited their employees from trading in Puerto Rico bonds when they had MNPI from the mediation.

ANSWER:     Silver Point lacks sufficient knowledge to either admit or deny the allegations in

paragraph 56 as to the practices of other participants to the mediation or the alleged "uniqueness"

of Silver Point's conduct.

57.     Unbeknownst to the other participants in the mediation, the barrier policy that Silver Point was relying on to trade was not enforced as to Fortgang, even though he was Silver Point's representative and had received MNPI from the mediation.

ANSWER:     Silver Point denies the allegations in paragraph 57.

58.     For example, on September 17, 2019, Fortgang, alone, attended the first Puerto Rico mediation session on behalf of Silver Point and received MNPI about the risks associated with Puerto Rico's fiscal plan. Following the session, Compliance correctly added Puerto Rico to Silver Point's watch list based on Fortgang's receipt of MNPI.

ANSWER:     Silver Point denies the allegations in paragraph 58, except admits that certain

records reflect that Fortgang, as Silver Point's legal counsel, attended an informational meeting

with counsel to the Financial Oversight and Management Board for Puerto Rico on September

17, 2019, that no Silver Point employee attended this meeting due to logistical reasons, and that

Silver Point Compliance personnel added Puerto Rico to the firm's watch list in anticipation of

the Private Side's participation in future mediation sessions, which were scheduled to begin the

following day.  To the extent that paragraph 58 purports to quote, characterize, or summarize

Silver Point's records, those documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents.

**59.** <u>During</u> **that confidential mediation session, Fortgang had a seven-minute call with a member of Silver Point's public side. Silver Point's barrier policy required that Compliance be alerted to the call. It was not. Because the call was not preapproved, Compliance was unable to determine whether it needed to be monitored and entered on the wall crossing log to ensure daily monitoring of trading in Puerto Rico bonds thereafter.**

**ANSWER:**    To the extent that paragraph 59 purports to quote, characterize, or summarize written call records and Silver Point's Compliance Manual, the documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 59, except admits that phone records reflect that Fortgang had a telephone call with a phone number associated with a Public Side employee who had no involvement with the Puerto Rico bonds.

**60.    Later that same day, the relevant members of Silver Point's public side approved a trading recommendation to purchase approximately $14.5 million Puerto Rico bonds.**

**ANSWER:**    To the extent that paragraph 60 purports to quote, characterize, or summarize Silver Point's records, those documents speak for themselves, and Silver Point respectfully refers the Court to the full text of these documents for their true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 60.  Moreover, Silver Point avers that the SEC's allegation misstates the timing of this trade recommendation and its approval; the trade recommendation was approved by one of the firm's Credit Committee analysts <u>prior</u> to the start of the Puerto Rico GO bond meeting.

**61.     Further, on September 19, 2019, Fortgang was present in Silver Point's Greenwich, Connecticut office. Silver Point's barrier policy required actual physical separation between the public and private sides in the office. Despite this, Fortgang was permitted to move unimpeded throughout the office, specifically including spaces where public side employees worked—even sit next to the traders while they placed trades— without any oversight by Compliance, in contravention of the barrier policy.**

**ANSWER:**     Silver Point denies the allegations in paragraph 61, except admits that Fortgang,

as Silver Point's outside attorney, could obtain permission to meet with his client in Silver

Point's offices, just like any other outside lawyer.

**62.     Then, on September 20, 2019, Compliance improperly removed Puerto Rico bonds from the watch list, despite Fortgang still possessing MNPI from his attendance at the September 17, 2019 mediation session. As a result, subsequent trading in Puerto Rico bonds was not subject to the enhanced daily surveillance required by the barrier policy until it was added back to the watch list on October 25, 2019. In fact, Silver Point made 11 purchases of Puerto Rico bonds on four different days, in amounts totaling over $46 million, during that 5 $^1$/$_2$ week period.**

**ANSWER:**     The allegations in paragraph 62 contain characterizations and legal

conclusions to which no response is required.  To the extent any response is required, Silver

Point denies the allegations in paragraph 62, except admits that certain records reflect that (i)

Silver Point purchased certain Puerto Rico bonds between September 20, 2019 and October 25,

2019, and (ii) Silver Point Compliance personnel properly removed Puerto Rico from the firm's

watch list on September 20, 2019 because no Private Side employee had received MNPI and

future mediation sessions were postponed until October 2019.

**63.     Fortgang continued to possess MNPI until at least October 17, 2019, when that information was released to the public (and thus no longer constituted MNPI). Despite this, between September 17 and October 17, Fortgang had at least 123 calls with 11 different members of Silver Point's public side, including four calls with the primary analyst who covered Puerto Rico and recommended trades in Puerto Rico bonds and 15 calls with the executive who approved those trading recommendations. The barrier policy required that Compliance be alerted to these calls ahead of time and, depending on the nature of the calls, also log and monitor the calls, yet none of these things happened.**

**ANSWER:**     The allegations in paragraph 63 contain characterizations and legal

conclusions to which no response is required.  Further, to the extent that paragraph 63 purports to

quote, characterize, or summarize call records and Silver Point's Compliance Manual, the documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents. To the extent that any response is required, Silver Point denies the allegations in paragraph 63, except admits (i) that the Puerto Rico Fiscal Agency and Financial Advisory Authority released to the public certain information relating to the mediation on October 17, 2019, and (ii) that certain records reflect calls between September 17, 2019, and October 17, 2019 between Fortgang and Silver Point employees, including Public Side employees, on a number of matters, including those unrelated to the Puerto Rico bonds, though the same records suggest that many of these calls were under one minute in duration, may have been unanswered, and that the SEC's allegations are overstated.

**64.    Between October 25, 2019 and February 9, 2020, Fortgang received additional MNPI in connection with the confidential mediation, including settlement offers exchanged by the parties on October 25, October 30, November 5, November 7, November 8, December 16, and December 30. Fortgang also attended in-person mediation sessions on November 5, 2019 and December 16, 2019 at which MNPI was exchanged.**

**ANSWER:**    The allegations in paragraph 64 contain characterizations and legal conclusions to which no response is required.  Silver Point denies the allegations in paragraph 64, except admits that certain records reflect that Fortgang attended a mediation session on November 5, 2019 and received information and settlement offers, some of which may have included MNPI, during the relevant period.

**65.    During this <u>same</u> period, Fortgang had at least 394 calls with 17 different members of Silver Point's public side, including 36 calls with the primary analyst who recommended trades in Puerto Rico bonds and 22 calls with the executive who approved Puerto Rico bonds trading recommendations.**

**ANSWER:**    Silver Point denies the allegations in paragraph 65, except admits that certain records reflect calls between Fortgang and Silver Point employees, including Public Side employees, on a number of matters, including those unrelated to the Puerto Rico bonds, though

the same records suggest that many of these calls were less than one minute in duration, may have been unanswered, and that the SEC's allegations are overstated.

**66.    For instance, on November 5, 2019, <u>while</u> Fortgang was physically present in a mediation session and had just received MNPI in the form of a settlement offer by Puerto Rico, Fortgang called the primary analyst who covered Puerto Rico. The two spoke for two minutes. The analyst, in requesting the call, knew Fortgang was attending the mediation session and that MNPI would have been exchanged at the start of the mediation session, yet neither he nor Fortgang alerted Compliance, in contravention of the barrier policy.**

**ANSWER:**    The allegations in paragraph 66 contain characterizations and legal conclusions to which no response is required.  To the extent that paragraph 66 purports to quote, characterize, or summarize Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent that any response is required, Silver Point denies the allegations in paragraph 66, except admits that certain records reflect that Fortgang had a two-minute phone call with a Public Side employee on an unrelated matter.

**67.    Indeed, the barrier policy required Compliance to preapprove all 394 calls between Fortgang and the public side and, potentially, monitor and log them as well. However, none of the calls were preapproved, much less monitored or logged by Compliance. As a result, the nature and substance of the calls is unknown.**

**ANSWER:**    To the extent that paragraph 67 purports to quote, characterize, or summarize Silver Point's Compliance Manual, the document speaks for itself, and Silver Point respectfully refers the Court to the full text of the document for its true and accurate contents.  To the extent any response is required, Silver Point denies the allegations in paragraph 67.

**68.    In addition, on December 3, 2019, while Fortgang was still in possession of MNPI learned during the October and November 2019 negotiations, he twice called the same analyst who covered Puerto Rico bonds. Later that afternoon, the analyst sent a draft trading recommendation to his supervisor. The next day, Fortgang again called the analyst and the two spoke for four minutes. Under the barrier policy, Compliance should have been alerted to each of these calls in advance, but it was not.**

**ANSWER:**    The allegations in paragraph 68 contain characterizations and legal conclusions to which no response is required.  To the extent that paragraph 68 purports to quote, characterize, or summarize certain records and Silver Point's Compliance Manual, the documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents.  To the extent that any response is required, Silver Point denies the allegations in paragraph 68, except admits that certain records reflect that Fortgang twice called a number associated with a Silver Point Public Side employee on December 3, 2019 about matters unrelated to the mediation.

**69.    A few hours later, the analyst circulated a final trading recommendation to purchase additional Puerto Rico bonds. The recommendation was approved the same day, and, between December 4 and December 12, Silver Point bought more than $54 million Puerto Rico bonds.**

**ANSWER:**    To the extent that paragraph 69 purports to quote, characterize, or summarize Silver Point's records, the documents speak for themselves, and Silver Point respectfully refers the Court to the full text of the documents for their true and accurate contents.  To the extent a response is required, Silver Point denies the allegations in paragraph 69, except admits that Silver Point purchased certain Puerto Rico bonds on December 9, 11, and 12, 2019.

**70.    On December 12, 2019, Fortgang was again in Silver Point's office. While Fortgang was present in the office, but not subject to the public/private physical separation required by the barrier policy, the public side analyst responsible for covering Puerto Rico bonds circulated a "TIME SENSITIVE" trading recommendation to purchase additional Puerto Rico bonds. The recommendation was approved the following day, and Silver Point then bought a total of over $18 million of Puerto Rico bonds.**

**ANSWER:**    Silver Point denies the allegations in the first sentence of paragraph 70, except

admits that certain records reflect that Fortgang, as Silver Point's long-time, outside legal

counsel, may have been present in Silver Point's offices on December 12, 2019 to attend

meetings unrelated to the GO bond mediation.  To the extent paragraph 70 purports to quote,

characterize, or summarize Silver Point's records or Compliance Manual, the documents speak

for themselves, and Silver Point respectfully refers the Court to the full text of the documents for

their true and accurate contents.  To the extent any further response is required, Silver Point

denies the allegations in paragraph 70, except admits that Silver Point purchased certain Puerto

Rico bonds on December 13, 2019.

**71.    As exemplified above, Silver Point's barrier policy, which merely provided generally that consultants such as Fortgang "may" be subject to it, failed to address an obvious risk inherent in its business model—Fortgang's possession of MNPI from participating on creditors' committees on behalf of Silver Point for more than 17 years and his untrammeled access to the public side with no oversight, or even notice to the Compliance staff responsible for oversight.**

**ANSWER:**    Paragraph 71 consists of characterizations to which no response is required.  To

the extent any response is necessary, Silver Point denies the allegations.

**72.    Silver Point neither established nor enforced the barrier policy as to Fortgang. As a result, there was a substantial risk that Fortgang would, advertently or inadvertently, pass MNPI about an entity to the public side of Silver Point, thus influencing its trading decisions. Whether Fortgang *in fact* ever passed MNPI to the public side is impossible to know, precisely because of Silver Point's failures.**

**ANSWER:**    Paragraph 72 consists of characterizations to which no response is required.  To

the extent any response is necessary, Silver Point denies the allegations.

73.     Silver Point executed a statute of limitations tolling agreement with the Commission on July 29, 2024, tolling the statute of limitations period for 90 days.

ANSWER:     Silver Point denies the allegations in paragraph 73, except admits that it entered into a tolling agreement with the Commission tolling the running of the applicable statute of limitations for the period beginning on July 29, 2024 through October 26, 2024.

VII.   **FIRST CLAIM FOR RELIEF:  Violation of Section 204A of the Advisers Act**

74.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

ANSWER:     Silver Point incorporates by reference its responses to paragraphs 1 through 73.

75.     At all times relevant to the Complaint, Defendant, while acting as an investment adviser, failed to establish, implement, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent the misuse in violation of the Advisers Act [15 U.S.C. § 80b-1 et seq.], or the Securities Exchange Act of 1934 [15 U.S.C. § 78a et seq.], or the rules or regulations thereunder, of material nonpublic information by such investment adviser or any person associated with such investment adviser.

ANSWER:     The allegations in paragraph 75 are legal conclusions to which no response is required. To the extent any response is necessary, Silver Point denies the allegations.

76.     By reason of the foregoing, Defendant violated Section 204A of the Advisers Act [15 U.S.C. § 80b-4a].

ANSWER:     The allegations in paragraph 76 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations.

VIII.  **SECOND CLAIM FOR RELIEF:  Violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 Promulgated Thereunder**

77.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

ANSWER:     Silver Point incorporates by reference its responses to paragraphs 1 through 73.

**78.     At all times relevant to the Complaint, Defendant, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, while acting as a registered investment adviser that provided advice to clients, failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder.**

**ANSWER:**     The allegations in paragraph 78 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations.

**79.     By reason of the foregoing, Defendant violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-7 thereunder [17 CFR § 275.206(4)-7].**

**ANSWER:**     The allegations in paragraph 79 are legal conclusions to which no response is required.  To the extent any response is necessary, Silver Point denies the allegations.

<u>**AFFIRMATIVE DEFENSES**</u>

Silver Point alleges, asserts, and states the following defenses as separate and distinct defenses to the Complaint.  By virtue of alleging these further defenses, Silver Point does not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.

**FIRST DEFENSE**

The Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

Silver Point did not have, and Plaintiff failed to provide, fair notice that its conduct was in violation of law, in contravention of Silver Point's due process rights.  Due process requires that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. Here, due to the lack of clarity and fair notice regarding Silver Point's obligations under the law, in addition to the lack of clarity and fair notice regarding Plaintiff's interpretation of the law, Silver Point lacked fair notice that its conduct was prohibited.

### THIRD DEFENSE

Plaintiff's claim for an injunction is barred, in whole or in part, by the Plaintiff's failure to allege a reasonable likelihood of future violations by Silver Point.

### FOURTH DEFENSE

Plaintiff's claim for relief and/or civil monetary penalties is barred, in whole or part, by an applicable statute of limitations.

### <u>RESERVATION OF RIGHTS</u>

Silver Point presently has insufficient knowledge or information upon which to form a belief as to whether there may be other, as yet unstated, defenses available to Silver Point, and therefore expressly reserves, in accordance with applicable law, the right to amend or supplement its Answer, defenses and all other pleadings, and the right to assert any and all other additional and further defenses as appropriate, including defenses that may be revealed by discovery or otherwise.

Dated: New York, New York    DEBEVOISE & PLIMPTON LLP
      February 18, 2025

                                                  _____
                                                  Andrew J. Ceresney, phv208483
                                                  Stephan J. Schlegelmilch, phv208478
                                                  Allison Miller, phv208482

                                                  DEBEVOISE & PLIMPTON LLP
                                                  66 Hudson Boulevard
                                                  New York, New York 10001
                                                  Tel: (212) 909-6000
                                                  Fax: (212) 909-6836
                                                  aceresney@debevoise.com

                                                  *Attorneys for Defendant Silver Point Capital, L.P.*